IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

SAN ANTONIO FIREFIGHTERS' ASSOCIATION,
LOCAL 624,
    *Plaintiff*

v.

THE CITY OF SAN ANTONIO, TEXAS,
    *Defendant*

NO. 5:18-CV-00745-XR

# Defendant's Motion for Summary Judgment

To the Honorable Court:

Pursuant to FED. R. CIV. P. 56, Defendant the City of San Antonio, Texas moves for summary judgment on all claims brought by Plaintiff San Antonio Firefighters' Association, Local 624. The City respectfully requests oral argument on this motion.

## Summary and Grounds

The City of San Antonio has a policy restricting free-speech activity on the grounds outside its public libraries to designated "free speech areas," and has a separate policy restricting political activity at Senior Centers operated by the City. Under these policies, the City does not allow anyone to solicit signatures outside the entrances to its public-library branches and senior centers. The Plaintiff claims that these policies are unconstitutional, but those claims fail as a matter of law:

- The policies do not violate the free-speech clauses of the federal or state constitutions because: (1) The exterior grounds of the City's libraries and senior centers are non-public forums; (2) The policies are reasonable in light of the intended purposes of these respective municipal facilities; and (3) The policies do not discriminate on the basis of the speaker's viewpoint.

- Plaintiff's retaliation claim fails, because the undisputed evidence shows that the challenged policies were developed and adopted years before the Plaintiff announced its petition drive and have been consistently applied since.

- The policies are not unconstitutionally vague in violation of the federal due process and state due course of law provisions. The policies instead provide fair notice of the conduct they proscribe and objective guidelines for enforcement.

The City is therefore entitled to summary judgment on all claims.

## Undisputed Facts

**The City Library's "Free Speech Area" Policy.** The San Antonio Public Library is governed by an 11-member Board of Trustees, each of whom is appointed by a member of the City Council, with one member appointed by the Mayor. The Board appoints a Library Director to manage the operations of the library system. Exhibit 1 ¶ 3.

In 2013, the Library Director adopted a policy governing the use of library property for freedom of expression activities by members of the public. With respect to the exterior grounds of library property, each City-owned library branch designated a "Free Speech Area" on the grounds of the library where members of the public could exercise their First Amendment rights:

> EXTERIOR GROUNDS
> The Library has a policy of allowing the use of portions of the exterior grounds of library property by the public for free speech activities including campaigning, political statements, announcements, speeches, and distributing literature. The First Amendment to the United States constitution protecting freedom of speech allows the Library to regulate these activities on the basis of "time, place, and manner," to protect other public purposes. Library Administration has approved the designation of "Free Speech Areas" at each location in coordination with your Branch Services Coordinator. Such Free Speech Areas should be selected to allow for a full range of freedom of speech activities while also affording adequate protection to the efficient functioning of the library.

Exhibit 1-1.

The spreadsheet attached as Exhibit 2-1 shows free speech area adopted in accordance with this policy for the Central Library and the twenty-six library branches located on property owned or controlled by the City. Exhibit 2 ¶ 2. The Library provides library services at three locations within buildings controlled by entities other than the City: the Briscoe Western Art Museum, Roosevelt High School, and the Mays Family YMCA. Because the Library does not control the exterior grounds of these three locations, there is no designated "free speech areas" outside these buildings. Exhibit 2 ¶ 3.

The library branches on City-owned property subject to the free-speech policy are all stand-alone buildings that include a surface parking lot and paved walkway connecting the parking lot to the building's entrance. The parking lots are for the use of customers conducting library business.

The walkways are intended to facilitate safe and efficient passage for library patrons entering and exiting the library and are not designed to be used as a thoroughfare for members of the general public to walk from one area to another for non-library reasons. Exhibit 1 ¶¶ 7–8.

**The City's Senior Center Policy.** The City's Department of Human Services operates ten comprehensive Senior Centers to serve City residents age 60 and over by providing access to a range of social services, such as health screenings, recreation and exercise activities, and nutrition programs. Exhibit 3 ¶¶ 2–3.

One of the City's comprehensive senior centers is the Northeast Senior Center, located at 4135 Thousand Oaks Boulevard. The Northeast Senior Center is a freestanding building surrounded by a surface parking lot. A public sidewalk and grassy median separate the surface lot from Thousand Oaks Boulevard. A covered walkway provides passage from the parking lot to the senior center entrance. Parking in the surface lot is available to seniors and visitors using or providing services at the senior center. The covered walkway facilitates safe and convenient access from the parking lot to the senior center's front door. Exhibit 3 ¶¶ 10–12.

The City's senior centers are operated by the City's Department of Human Services and supported by federal grants under the Older Americans Act of 1965. Exhibit 3 ¶ 4; *see* 42 U.S.C. § 3002(36). In Texas, the Texas Department of Aging and Disability Services administers those federal grants, and its regulations require that senior centers may not be used "for political campaigning except in those instances where a representative from each political party running in the campaign is given an equal opportunity to participate" and that "political materials" may not be distributed at a senior center. 40 TEX. ADMIN. CODE § 85.309(d) (attached as Exhibit 3-1). In 2015, the City's Department of Human Services adopted the following policy to comply with these regulations:

Allowable Activities:
- Centers are encouraged to inform seniors about voting procedures and their rights as citizens. Local groups may be called to explain sample ballots and voting procedures.

- Candidates for public office or their representatives are invited to frequent the common or public areas of the center and mingle informally at any time so long as they do not disrupt Center activities and they abide by all provisions of this policy.
- Seniors may wear candidate t-shirts as they have the right to express their political beliefs.
- Candidates may provide gifts to the centers for all seniors to enjoy, such as healthy refreshments or flowers, without political slogans or names on the items.

Prohibited Activities:

- Candidates for any public office may not address senior participants via political speech or campaign presentations.
- Candidates, or their representatives, may not display political messages, slogans, or advertisements, or candidate names on center property at any time. This includes any display, such as on buttons, t-shirts, caps, vehicles, etc.
- Candidates may not provide gifts to the center or senior participants with political messages, slogans, advertisements, or candidate names.
- Political or campaign materials may not be distributed at the centers or at any senior events by candidates, their representatives or senior participants, such as literature, buttons, posters or any other campaign material.
- Political or campaign materials may not be posted, distributed, or left in centers.
- City vehicles may not be used to transport seniors to political activities.
- Centers may not endorse any candidate, party or issue.

Exhibit 3-2. Pursuant to this policy, the City's Department of Human Services does not allow solicitations of any kind to take place in the parking lot and covered walkways outside the Northeast Senior Center. Exhibit 3 ¶¶ 7–9.

**The Union's petition-gathering activities.** The Plaintiff is a labor union and the exclusive bargaining agent for firefighters employed by the City. In March 2018, the Union launched a drive to put three measures on the ballot to amend the City Charter. In order to do so, the Union needed to collect 20,000 signatures on a petition for each initiative. TEX. LOCAL GOV'T CODE § 9.004.

Union members and contractors hired by the Union attempted to solicit petition signatures outside the entrances to a number of the City's library branches and the Northeast Senior Center.

Library staff told the signature-gatherers that pursuant to City policy, they were not allowed to solicit signatures outside the library entrances and directed the Union representatives to the designated "Free Speech Area" for that branch. Exhibit 2 ¶ 5–21; Exhibit 2-2. Staff at the Northeast Senior Center told Union representatives that pursuant to City policy, they were not allowed to solicit petition signatures in the covered walkway outside the senior center's entrance and directed them to the public sidewalk running along the perimeter of the parking lot as the closest area where signature-gathering would be allowed. Exhibit 3 ¶¶ 16–19. In some instances, the petitioners resisted moving from the entrances to the City's buildings until police were summoned and issued trespass warnings. No one was taken into custody. Exhibit 2-2; Exhibit 3 ¶¶ 18–19.

The City's enforcement of its policies at libraries and the Northeast Senior Center did not prevent the Union from obtaining a sufficient number of signatures to place the three initiatives on the ballot. The City Clerk certified all three petitions as having sufficient signatures, and the City Council ordered the measures placed on the ballot for the November 2018 general election. Exhibit 4. The voters ultimately approved two of the ballot measures, relating to the salary and term of the City Manager and the arbitration of contract disputes between the Union and City, while rejecting the third, which would have made it easier in the future to place charter initiatives on the ballot. Exhibit 5.

## Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Although factual controversies are resolved in favor of the nonmoving party, this is "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *State Farm Fire & Cas. Co. v. Flowers*, 854 F.3d 842, 844 (5th Cir. 2017). Summary judgment is not thwarted by "conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and "mandates the entry of summary judgment" for the moving party. *U.S. ex rel. Farmer*

v. *City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

# Argument

## I. The City's policies do not violate the free speech clause.

The Union complains that the City's policies restricting the solicitation of petition signatures to designated "free speech areas" at library branches and to public sidewalks at senior citizen centers violate the First Amendment's free speech clause. The Union's claim fails as a matter of law because: (1) the areas outside the City's library branches and senior centers are not public forums, (2) the policies are reasonable, and (3) the policies are viewpoint-neutral.

### A. The nature of the forum determines the level of scrutiny under the First Amendment.

"[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *U.S. Postal Serv. v. Council of Greenburgh Civic Assocs.*, 453 U.S. 114, 129 (1981). Instead, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). Even activity central to the purpose of the First Amendment—such as the solicitation signatures for a ballot initiative—may be regulated or even prohibited on certain government-owned property:

> It is hard to imagine many activities more central to the purpose of the First Amendment than collecting signatures on a petition with the goal of placing an issue before the electorate. Yet even such a worthwhile endeavor is not altogether free of government regulation when it takes place on government property dedicated to other types of public business.

*Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1069–70 (D.C. Cir. 2012).

The public's right of access to public property under the First Amendment thus depends on the nature of the forum. Precedent from the U.S. Supreme Court and the Fifth Circuit recognizes four different types of forums:

**1. Traditional public forums.** Traditional public forums are places that "by long tradition or by government fiat have been devoted to assembly or debate." *Cornelius v. NAACP Leg. Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). This type of forum includes "streets and parks

which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry*, 460 U.S. at 45 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).

For a traditional public forum, any state regulation must withstand strict scrutiny, *i.e.*, the government must show that a restriction or prohibition on public access serves a compelling state interest and is narrowly tailored to serve that interest. *See id.*

**2. Designated public forums.** "[A] public forum may be created by government designation of a place or channel of communication for use by the public at-large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802. To create a designated public forum, "the government must make an affirmative choice to open up its property for use as a public forum." *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 206 (2003). "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse." *Cornelius*, 473 U.S. at 802. "If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998).

**3. Limited public forums**. A "limited public forum" is a forum opened for public expression of a particular kind or for a particular group. Examples include a student center on a public school campus, open to use by student groups, but not the public at large. *See, e.g.*, *Good News Club v. Milford Central School*, 121 S. Ct. 2093, 2100 (2001) (treating school facilities opened by a school district for a wide, but not unlimited, range of public expressive activities as a "limited public forum"); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) (describing campus facilities opened to student groups as a "limited" public forum).

For a limited public forum, the government may restrict the expression that takes place within the forum so long as the restriction (1) does "not discriminate against speech on the basis of viewpoint" and (2) is "reasonable in light of the purpose served by the forum." *Milford Central School*, 121 S. Ct. 2100.

**4.     Nonpublic forums.** Public property that is not by tradition or by designation open for public communication is a "nonpublic forum." "[A] forum may be considered nonpublic where there is clear evidence that the state did not intend to create a public forum or where the nature of the property at issue is inconsistent with the expressive activity, indicating that the government did not intend to create a public forum." *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 376 (5th Cir. 1989).

"A nonpublic forum, however, is not a private forum, and because it is a government-sponsored medium of communication, it is still subject to First Amendment constraints." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 347 (5th Cir. 2001) (*per curiam*). As with limited public forums, "[t]he government can restrict access to a nonpublic forum 'as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Ark. Educ. Television Comm'n*, 523 U.S. 677–78 (quoting *Cornelius*, 473 U.S. at 800).

### B.     The exterior grounds of the City's libraries and senior centers are non-public forums.

At its library branches, the City has created a "designated" public forum in the specific "free speech areas" on the library grounds. Exhibit 1-1; Exhibit 2-1. But outside of these designated free speech areas, the exterior grounds of the City's library branches are non-public forums. And the exterior grounds of the City's comprehensive senior centers are likewise non-public forums. These spaces are used to provide a place for visitors using the libraries or senior centers to park their cars and safely enter the building. Exhibit 1 ¶ 8; Exhibit 3 ¶¶ 13–15. These exterior areas are not "traditional" public forums—*i.e.*, they have not 'immemorially been held in trust for the use of the public," nor have they "time out of mind," been used "for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry*, 460 U.S. at 45 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939). Further, the City has not created a "designated" public forum by intentionally dedicating these exterior grounds for "public discourse," nor has the City made these areas a "limited" public forum by opening them to a particular kind of expression, such as the Union's signature-gathering activities. Under federal precedent, the walkways outside the libraries

and senior centers areas must therefore be classified as "non-public" forums for purposes of First Amendment analysis.

In *United States v. Kokinda*, 497 U.S. 720 (1990), for example, the Supreme Court upheld the constitutionality of a Postal Service regulation that prohibited "[s]oliciting alms and contributions" on a walkway that led from the parking lot to the front door of the post office building. *Id.* at 722–23. Writing for a plurality, Justice O'Connor held that the walkway was a nonpublic forum because "it [led] only from the parking area to the front door of the post office" and "was constructed solely to provide for the passage of individuals engaged in postal business." *Id.* at 727. Unlike other public sidewalks that serve as traditional public forums, the post office walkway was not a "public passageway" meant "to facilitate the daily commerce and life of the neighborhood or city." *Id.* at 727–28.

Although Justice O'Connor's opinion in *Kokinda* was a plurality opinion of four justices, rather than a majority opinion of the Court, federal courts of appeals have consistently followed the opinion's analysis with respect to interior walkways on government-owned property. In *Del Gallo v. Parent*, 557 F.3d 58 (1st Cir. 2009), for example, the First Circuit rejected a political candidate's claim that he had a First Amendment right to solicit signatures in support of his candidacy on a post-office sidewalk. The Tenth Circuit likewise held that "an open air, glass-covered pedestrian walkway approximately 600 feet long, with a width ranging between 32 and 40 feet" connecting public buildings at the Denver Performing Arts Complex is a non-public forum. *Hawkins v. City & County of Denver*, 170 F.3d 1281, 1284 (10th Cir. 1999). Most recently, the D.C. Circuit upheld a postal regulation prohibiting the collection of petition signatures on post-office walkways, holding that such walkways were nonpublic forums, because "interior postal sidewalks are not meant to serve as forums for free expression. They are neither public thoroughfares nor gathering places, but are typically used only by customers and employees of the post office and are built solely to provide efficient access to the post office." *Initiative & Referendum Inst.*, 685 F.3d at 1071 (citations omitted).

The same reasoning in *Kokinda* and subsequent cases applies to the walkways outside the City's library branches and the Northeast Senior Center where the Union sought to gather

signatures. These walkways connect the surface parking lot to the front entrance of the buildings. The surface parking lots are for the exclusive use of patrons of the facilities. The purpose of these walkways is to facilitate safe and efficient access to the public building for persons with business at the library or senior center. Exhibit 1 ¶ 8; Exhibit 3 ¶ 13. These walkways have not traditionally been sites for expressive activities, nor has the City designated them as public forums or otherwise opened them up for petition-gathering or similar conduct. They are therefore non-public forums for purposes the First Amendment.

The Union complains that electioneering was permitted outside the free-speech areas on election day at several library branches that serve as polling places, but this does not alter the analysis. The City does, in partnership with the Bexar County Elections Administrator, make some library branches available to serve as polling places for early and election-day voting. Exhibit 1 ¶ 11. Per state law, electioneering is not allowed within 100 feet of the door of a polling place and, if the polling place is a public building, electioneering cannot be prohibited outside that 100-foot zone. TEX. ELEC. CODE § 61.003.[1] These special requirements apply, however, only "during the voting period"—*i.e.*, on the days when votes are being cast. *Id.* The City's compliance with this law on the days that a library branch serves as a polling place does not transform the exterior of that location into a public forum on days when the branch does not serve as a polling place. Outside "the voting period"—*i.e.*, when the library branch is not a polling place—the State law does not apply, and the City is free to adopt reasonable regulations, such as the designated free-speech zones, for this non-public forum.

---

[1] The Union does not challenge these election-day restrictions on political activity, but it is worth noting that they are constitutional under well-established precedent. The U.S. Supreme Court has upheld government prohibitions on electioneering around a polling place, even for areas that overlap traditional public forums such as public sidewalks and streets. *Burson v. Freeman*, 504 U.S. 191, 193 (1992) (plurality opinion). Under this precedent, the Fifth Circuit upheld the constitutionality of a Louisiana law prohibiting the solicitation of petition signatures within 600 feet of the entrance to a polling place. *Schirmer v. Edwards*, 2 F.3d 117 (5th Cir. 1993). And the U.S. Supreme Court recently held that polling places themselves are nonpublic forums, meaning any restrictions on free-speech activity inside a polling place need only be reasonable. *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1886 (2018).

### C. The City's policies are reasonable.

As non-public forums, the City's policies with respect to the exterior grounds of the library branches and senior centers must be "reasonable." This standard affords substantial deference to the government's policies: A regulation is "reasonable" as long as it is consistent with the government's legitimate interest in maintaining the property for its dedicated use. *Perry Educ. Ass'n*, 460 U.S. at 50–51. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808 (emphasis in original).

Here, the City library's policy was adopted to protect "the efficient functioning of the library." Exhibit 1-1. A public library is "a place dedicated to quiet, to knowledge, and to beauty." *Brown v. Louisiana,* 383 U.S. 131, 142 (1966). "Its very purpose is to aid in the acquisition of knowledge through reading, writing and quiet contemplation. Thus, the exercise of other oral and interactive First Amendment activities is antithetical to the nature of the Library." *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1261 (3d Cir. 1992). Given these purposes, the City has a legitimate interest in protecting "the efficient functioning of the library" by restricting the solicitation of petition signatures from library patrons on the exterior grounds of library branches. Indeed, given that the exterior grounds are non-public forums, the library could, consistent with the First Amendment analysis of *Kokinda*, prohibit petition solicitation altogether on library property to further that legitimate interest; and so providing a designated free-speech area for those activities at each library branch is necessarily reasonable.

The City adopted its policy restricting political activity at senior centers "for the protection of centers from political pressure, to prohibit the use of City of San Antonio resources for political purposes and to avoid the appearance of bias or favoritism." Exhibit 3-2. These are all legitimate interests of the City, and a policy prohibiting the solicitation of petition signatures outside the entrances to senior centers reasonably serves those interests by minimizing disruption to seniors entering and exiting the building. *See Cornelius*, 473 U.S. at 806 ("[A] speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum .

. . ."). "[A] nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas. The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." *Id.* at 808.

The City's policies are consistent with the City's legitimate interest in maintaining its property for use as libraries and senior centers. The policies are reasonable, therefore, as a matter of law.

### D. The City's policies are viewpoint-neutral.

"[I]f a governmental regulation is based on the content of the speech or the message, that action must be scrutinized more carefully to ensure that communication has not been prohibited merely because public officials disapprove the speaker's view." *Council of Greenburgh Civic Assocs.*, 453 U.S. at 132 (quotation omitted). The City's library and senior center policies are "content-neutral"—that is, they both prohibit the gathering of petition signatures regardless of the speaker's message. Exhibit 1 ¶ 10; Exhibit 3 ¶ 9. As a matter of law, therefore, the policies are viewpoint neutral, and applying those policies to the Union is therefore not unlawful viewpoint discrimination.

## II. The City did not "retaliate" against the Union.

To establish a First Amendment retaliation claim, a plaintiff must show (1) the plaintiff engaged in a constitutionally protected activity; (2) the defendant took adverse actions that would "chill a person of ordinary firmness from continuing to engage in that activity"; (3) the defendant's adverse actions were substantially motivated by the plaintiff's protected speech. *Culberson v. Lykos*, 790 F.3d 608, 618 (5th Cir. 2015). Here, the Union's First Amendment retaliation claim fails as a matter of law on at least the last two elements: (1) asking the Union to move to a "free speech area" or public sidewalk and calling police and providing an oral trespass notice when the Union refused are not sufficient adverse actions for purposes of a retaliation claim; and (2) the City's actions were not motivated by the Union's protected speech, but rather as part of the City's consistent enforcement of its pre-existing policies.

First, Fifth Circuit case law requires that an alleged retaliatory action be sufficiently "adverse" before triggering liability. That is, before bringing a retaliation claim a "plaintiff must cross a certain threshold of harm." *Matherne v. Larpenter*, 216 F.3d 1079, 2000 WL 729066, at *3 (5th Cir. May 8, 2000) (*per curiam*). By themselves, "retaliatory criticisms, investigations, and false accusations that do not lead to some more tangible adverse action are not actionable." *Colson v. Grohman*, 174 F.3d 498, 512-13 & n.7 (5th Cir. 1999). Instead, the plaintiff must suffer some more concrete harm from the alleged retaliation, such as termination from employment, formal public reprimand, or being taken into custody. In *Matherne*, for example, the plaintiff alleged that the local sheriff issued a criminal misdemeanor summons against her in retaliation for her campaign opposition. 216 F.3d 1079, 2000 WL 729066, at *3. The Fifth Circuit concluded that the issuance of the criminal summons was not actionable under the First Amendment because the plaintiff was "never subject to a restriction of her liberty" and the consequences of a summons were not analogous to an arrest or indictment. *Id.*; *see also Brogan v. Tunkhannock Township*, 302 F. Supp. 3d 670, 683 (M.D. Pa. 2018) (rejecting argument that threat of arrest alone, without actual arrest or prosecution, constitutes a retaliatory action under the First Amendment).

Here, the Union's representatives that showed up at the City's libraries were asked to move to the branch's designated free-speech area. Exhibit 1 ¶ 12; Exhibit 2 ¶ 6. And those that showed up at the Northeast Senior Center were asked to move to the nearest public sidewalk. Exhibit 3 ¶¶ 16–19. In some instances, when Union representatives refused to comply, the police were called, who issued oral trespass warnings and threatened arrest if the petition solicitors did not move. *See* TEX. PENAL CODE § 30.05(a)(1). But no Union representative was taken into custody, indicted, reprimanded, terminated from employment, or suffered any of the other concrete, adverse actions necessary to meet the threshold requirements for a retaliation claim under Fifth Circuit precedent. And, in the end, it is undisputed that enforcement of the City's policies at its libraries and senior centers did not prevent the Union from successfully collecting the requisite number of signatures to place the measures on the ballot. Exhibit 4. As a matter of law, the City took no "adverse actions" regarding the Union's petitioning activities that would "chill a person of ordinary firmness from

continuing to engage in that activity." *Culberson*, 790 F.3d at 618 (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)).

Second, the undisputed evidence shows that the challenged policies were adopted and enforced years before the Union began its petition drive in March 2018. Exhibit 1 ¶¶ 4–6; Exhibit 3 ¶¶ 4–9. There is thus no evidence that the policies were motivated at all by the Union's petition gathering activities, much less "substantially motivated," as required for a retaliation claim. The Union complains about the signage posted at library entrances regarding petition activities (ECF 26 ¶¶ 20–23), but it is undisputed that the information on the signs was legally accurate information about permissible petition gathering activities. Exhibit 1-2. And the fact that the City's Mayor publicly "expressed his strong disapproval" of the merits of the Union's proposed ballot measures (ECF 26 ¶ 9) is likewise no evidence that the City retaliated against the Union by requiring the Union to abide by the City's valid, pre-existing policies on the use of public library grounds and senior centers.

Accordingly, on either of these two independent grounds—lack of adverse action and lack of retaliatory motive—the City is entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

### III. The City's policies are not unconstitutionally vague.

"[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972)). The City's free-speech zone policies impinge on neither of these concerns.

To begin, the City's library policy is not vague—each branch has designated a specific area on the premises as a "free speech zone." Exhibit 1-1; Exhibit 2-1. The Union may solicit petition signatures in those zones, but not elsewhere on the library grounds. Exhibit 2 ¶ 5. And with respect to senior centers, the Union may not solicit petition signatures anywhere on the premises, but may

use the public sidewalks adjoining the public streets surrounding the centers. Exhibit 3 ¶ 15. Evidence of the practices enforced by the City confirms regulated parties were sufficiently informed what was required of them by library and senior center personnel: to solicit signatures only in the library's designated free speech area or on the public sidewalk adjoining the senior center. Exhibit 2-2; Exhibit 3 ¶¶ 16–19; *see Powell v. Ryan*, 855 F.3d 899 (8th Cir. 2017) (looking to the verbal trespass warnings plaintiff received as clear notice what activities were prohibited on state fairground).

Further, neither the library nor senior center policy invites subjective interpretation and policymaking on the part of enforcing officials. *See Grayned*, 408 U.S. at 108 ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications."). Compliance with the library policy is measured by the objective standard of whether an individual is located within the designated free speech area at each branch. Exhibit 1 ¶ 5; Exhibit 1-2. At senior centers, compliance is likewise measured by whether a solicitor of petition signatures is located anywhere on the senior center's grounds, because all such activity is prohibited. Exhibit 3 ¶ 15. Indeed, all evidence of the City's pattern of enforcement demonstrates that the City has interpreted and implemented both policies consistently and uniformly. Exhibit 1 ¶ 10; Exhibit 3 ¶ 9; *see Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)("[W]e must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it.").

Because the challenged policies provide fair notice of the conduct they proscribe and objective guidelines for enforcement, the City's free speech area policies and practices are not impermissibly vague.

**IV.     The Union's state-law claims fail for the same reasons as the federal ones.**

In addition to the federal constitutional claims discussed above, the Union asserts that the City's policies violate the free-speech and due-course-of-law provisions of the Texas Constitution. (ECF 26 ¶¶ 59–63) Unless a plaintiff can show how and why the State Constitution provides additional protection, Texas courts do not treat claims under these provisions differently from their federal counterparts. *See, e.g.*, *Tex. Dep't of Transp. v. Barber*, 111 S.W.3d 86, 106 (Tex. 2003) ("[W]e

decline to hold that the Texas Constitution affords Barber greater rights than does the First Amendment."). The Union offers no such reasons here, and to the contrary, allege that the relevant rights guaranteed under the Texas Constitution are "consistent with federal law." ([ECF 26](#) ¶¶ 61, 63) Because those federal claims fail, as detailed above, the state-law ones therefore must fail as well. *See Ex parte Morales*, [212 S.W.3d 483](#), 489 (Tex. App.—Austin 2006, pet. ref'd) ("Because Morales assumes that the Texas constitutional protections are coextensive with the federal counterparts, we need only consider the scope of the federal protections.").

## Prayer

For the foregoing reasons, Defendant the City of San Antonio prays that this Court grant this motion and enter a take-nothing judgment on all claims brought by Plaintiff San Antonio Firefighters' Association, Local 624. Defendant prays for such other and further relief, whether at law or in equity, to which it may show itself to be justly entitled.

DATED: March 15, 2019

                Respectfully submitted,

                GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
                401 Congress Avenue, Suite 2200
                Austin, Texas 78701
                (512) 480-5600
                (512) 480-5804 (facsimile)

By: */s/William Christian*
        William Christian
        Texas State Bar No. 00793505
        wchristian@gdhm.com
        Marianne W. Nitsch
        Texas State Bar No. 24098182
        mnitsch@gdhm.com

Deborah Lynne Klein
State Bar No. 11556750
deborah.klein@sanantonio.gov
OFFICE OF THE CITY ATTORNEY
Litigation Division
111 Soledad Street, 10th Floor
San Antonio, TX 78205
(210) 207-8919 – Phone
(210) 207-4357 – Fax
ATTORNEYS FOR DEFENDANTS

## Certificate of Service

I hereby certify that on March 15, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

David M. Feldman
Cris D. Feldman
William X. King
3355 West Alabama St., Suite 1220
Houston, Texas 77098
cris.feldman@feldman.law
david.feldman@feldman.law
will.king@feldman.law

Attorneys for Plaintiff

                */s/ William Christian*