**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| SAN ANTONIO FIREFIGHTERS' ASSOCIATION, LOCAL 624, | § § § | |
| *Plaintiff*, | § § | |
| | § | Civil Action No.  SA-18-CV-745-XR |
| v. | § § | |
| THE CITY OF SAN ANTONIO, TEXAS, | § § | |
| *Defendant*. | § § | |
| | § | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

On this date, the Court considered Defendant City of San Antonio's motion for summary judgment (docket no. 31), Plaintiff San Antonio Firefighters' Association, Local 624's response (docket no. 39), Defendant's reply (docket no. 42), Plaintiff's supplemental response (docket no. 50), Defendant's supplemental reply (docket no. 51), and both parties' arguments on August 20, 2019 (docket no. 53). After careful consideration, the Court GRANTS Defendant's motion with respect to all claims.

## BACKGROUND

Plaintiff San Antonio Professional Firefighters' Association (the "Union") is a labor union and the exclusive bargaining agent for firefighters employed by the City of San Antonio. Docket no. 26 at 2. The undisputed facts are that on February 20, 2018, the Union launched the "San Antonio First" ballot initiative. *Id.* The initiative sought various amendments to the City of San Antonio's municipal charter such as requiring the city to agree to arbitration in the event of an impasse in collective bargaining. *Id.*

To certify such a charter amendment petition and submit the measure to voters, state law requires the signatures of five percent of the qualified voters in the municipality, or 20,000 signatures, whichever number is smaller. TEX. LOC. GOV'T CODE § 9.004(a).

In March 2018, Union representatives began to gather those signatures along the walkways outside branches of the City of San Antonio Public Library System (the "library") as well as the Northeast Senior Center (the "senior center"), a facility operated by the City's Department of Human Services. Docket no. 31-2 at 16-23; docket no. 31-3 at 3.

Both the library and senior center had policies governing such political activities on their grounds. In 2013, the library established a policy of "allowing the use of portions of the exterior grounds of library property by the public for free speech activities including campaigning, political statements, announcements, speeches, and distributing literature." Docket no. 31-1 at 1, 5. The policy directed library supervisors and branch services coordinators to select a "Free Speech Area … to allow for a full range of freedom of speech activities while also affording adequate protection to the efficient functioning of the library." *Id.* The policy provided no further guidance concerning the placement of the free speech areas, such as directing branch managers to consider size of the available space or distance from the library. Docket no. 31-2 at 3-7; docket no. 50-1 at 86.



**Tobin Library (Docket no. 31-2 at 3)**



**Julia Semmes Library (Docket no. 31-2 at 5)**



**Parman Library (Docket no. 31-2 at 4)**



**Brook Hollow Library (Docket no. 31-2 at 7)**



**Westfall Library (Docket no. 31-2 at 6)**

In contrast to the library's free speech areas, there is no such zone on the grounds of the senior center. Docket no. 31-3 at 4; docket no. 31-3 at 4, 9. Because the City's senior centers receive federal grants, they are subject to Texas Department of Aging and Disability Services regulations barring distribution of "political materials" and prohibiting political campaigning unless each political party running is given an equal opportunity to participate. 40 TEX. ADMIN. CODE § 85.309(d). The senior center's policy (the "Political Activity Policy") with respect to activities inside the senior center is intended to protect the centers from "political pressure, to prohibit use of City of San Antonio resources for political purposes, and to avoid the appearance

of bias or favoritism." Docket no. 31-3 at 9. The policy prohibits the centers from "endors[ing] any candidate, party, or issue" and prohibits the presentation and posting of political and campaign materials. *Id.* at 9-10. The senior center manager must approve in advance anyone that wants to make a presentation at the senior center. Docket no. 50-2 at 54-55.



**Northeast Senior Center (Docket no. 31-3 at 3)**

When library staff encountered Union representatives gathering signatures outside their building entrances in March 2018, staff gave the representatives a copy of the Free Speech Policy and requested that they relocate to each library's Free Speech Area. Docket no. 31-2 at 16-23; docket no. 31-3 at 4-5. Similarly, the senior center staff informed the representatives that signature gathering was prohibited on senior center grounds and requested that the representatives relocate to the nearest public sidewalk. Docket no. 31-3 at 5. In some instances, the Union representatives refused to relocate, and the library and senior center staff called the San Antonio Police

Department. Docket no. 31-2 at 16-23; docket no. 31-3 at 5. The police issued verbal trespass warnings and threatened arrest but did not arrest or charge any representative with a crime. Docket no. 31 at 13.

In addition, shortly after the Union representatives began gathering signatures, the library distributed signs to each branch manager to post on library grounds, informing library patrons of their rights with respect to any petitions on library grounds. Docket no. 31-1 at 6.

---

**Petition Drive Information**

Individuals may be around this area attempting to gather signatures for petitions.  Please be aware of the following:

- You should be allowed to read the petition before you agree to sign or not.

- You should not be pressured or intimidated into signing.

- You should not be offered any money or anything of value in exchange for your signature.

**If you have any concerns about petition gathering please contact the City of San Antonio at:**

**(210)-207-8952 or (210)-207-5066**

---

**Text of Library Signs (Docket no. 31-1 at 6)**

On July 19, 2018, the Union filed its Original Complaint, docket no. 1, which was amended on October 18, 2018. Docket no. 26.[1] The Union brings free speech and retaliation claims under

---

[1] Plaintiff's suit initially included claims against Mayor Ron Nirenberg, City Attorney Andrew Segovia, Public Library Director Ramiro Salazar, and Chief of Police William McManus acting in their official capacity. This Court

the First Amendment, an unconstitutional vagueness claim under the First and Fourteenth Amendments, and free speech and vagueness claims under the Texas Constitution. *Id.* The City now moves for summary judgment on all claims. Docket no. 31.

## DISCUSSION

### I.     Standard of Review

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). Once the movant carries its initial burden, the burden shifts to the non-movant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991).

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the non-movant, or, in other words, that the evidence favoring the non-movant is insufficient to enable a reasonable jury to return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the non-movant as well as the "evidence supporting the moving party that

---

granted Defendant's motion to dismiss those official-capacity claims as redundant, leaving only the City of San Antonio as Defendant. Docket no. 20.

is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the non-moving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## II.     Analysis

The Union brings the following claims under the United States Constitution: violation of free speech, retaliation, and vagueness or lack of fair notice. The Union also brings claims for violation of free speech and vagueness under the Texas Constitution. The City moves for summary judgment on all claims.

### A.  Plaintiff's Free Speech Claim

The City argues summary judgment is warranted on the First Amendment claim because: (1) the library and senior center exteriors are nonpublic forums, (2) the policies are reasonable, and (3) the policies are viewpoint neutral. The Union, in turn, bifurcates its argument; it argues that the *library* is a designated public forum and, as such, any restrictions on free speech activities are subject to a more restrictive constitutional standard. The Union argues the City's actions do not pass constitutional muster because (1) the selection of the free speech areas at the library were ad hoc designations that were not narrowly drawn to achieve the City's purported interests and thus did not leave open ample alternative channels for signature-gathering, and (2) the City's posting signage in response constitutes viewpoint discrimination. As to the *senior center*, the Union concedes it is a nonpublic forum but argues the policy there lacks sufficient standards and is therefore susceptible to viewpoint discrimination. The Court will first conduct a

forum analysis to determine the classification of each forum at issue and will then apply the applicable level of scrutiny.

### i.  Forum Analysis

As applied to the states through the Fourteenth Amendment to the United States Constitution, the First Amendment prohibits the government from making laws that "abridg[e] the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.

Still, "[t]he First Amendment does not guarantee access to property simply because it is owned or controlled by the Government." *U. S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 114 (1981). The scope of Plaintiff's First Amendment rights depends on the nature of the forum to which they seek access. *TURF v. City of San Antonio*, No. SA-08-CA-972-XR, 2009 WL 10701038, at *3 (W.D. Tex. Jan. 9, 2009) (citing *Estiverne v. Louisiana State Bar Ass'n*, 863 F.2d 371, 376 (5th Cir. 1989)). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Estiverne*, 863 F.2d at 376 (quoting *Cornelius v. NAACP Leg. Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985)).

Rather, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44 (1983). The relevant forum is defined by the "access sought by the speaker." *Estiverne*, 863 F.2d at 376. Courts have delineated four types of forums.

First, traditional public forums are places that "by long tradition or by government fiat have been devoted to assembly or debate," such as public streets and parks. *Id.* In these places, the government may impose "regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry,* 460 U.S. at 45. If the government's restriction is content-based, such a restriction is subject to strict scrutiny, i.e. the state must show that its regulation is necessary to achieve a compelling state interest. *Id.*

Second, designated public forums are "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802. Such a forum cannot be created by government "inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Id.* "If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998).

Third, a limited forum "exists where a government has 'reserv[ed a forum] for certain groups or for the discussion of certain topics.'" *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015) (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). The distinction between a designated and limited public forum turns on two factors: (1) the government's intent with respect to the forum, and (2) the nature of the forum and its compatibility with the speech at issue. *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001). Restrictions on speech in limited public forums are permissible so long as they are

viewpoint neutral and reasonable in light of the purpose served by the forum. *Good News Club v. Milford Centr. Sch.*, 533 U.S. 98, 106 (2001).

Finally, a nonpublic forum is "public property that is not by tradition or designation open for public communication." *Chiu*, 260 F.3d at 347 (citing *Estiverne*, 863 F.2d at 376 ("[A] forum may be considered nonpublic where there is clear evidence that the state did not intend to create a public forum or where the nature of the property at issue is inconsistent with the expressive activity, indicating that the government did not intend to create a public forum"). The Supreme Court has treated limited nonpublic forums as subject to the same standard – reasonable and viewpoint neutral. *Freedom from Religion Found., Inc. v. Abbott*, No. A-16-CA-00233-SS, 2016 WL 7388401, at *6 n.5 (W.D. Tex. Dec. 20, 2016) (citing *Am. Freedom Def. Initiative v. King Cty., Wash.*, 136 S. Ct. 1022, 1023 (2016)).

Here, the parties do not dispute that the senior center is a nonpublic forum. Docket no. 31 at 8; docket no. 50 at 7.  The dispute thus centers on the classification of the library branches. As a preliminary matter, the relevant forums are the exterior walkways on which representatives stood, and not, as the Union argues[2], the library as a whole. The perimeters of the relevant forum are determined by the type of access sought by the speaker, and where limited access is sought, courts apply a "more tailored approach to ascertaining the perimeters of a forum within the confines of the government property." *Cornelius*, 473 U.S. at 801. Here, there is no indication the Union sought to petition anywhere other than the exterior grounds leading to the entrances of the buildings, as such areas would permit the Union representatives to obtain signatures from library

---

[2] Despite its briefing, at oral argument the Union conceded it was not looking for relief as to the interior of the library branches, nor was the Union seeking relief regarding the entry way or sidewalks leading to the entrance of the branch libraries.

patrons entering or exiting the library. Docket no. 31-2 at 16-23. Under *Cornelius*, the Court must limit its analysis to those exterior grounds.[3]

With the exterior grounds of the library as the relevant forum, the undisputed facts lead to the conclusion that such grounds are nonpublic forums.[4] One, the libraries are not traditional public forums in that they have not "by long tradition or by government fiat have been devoted to assembly or debate." *Estiverne*, 863 F.2d at 376. Two, they are not designated public forums in that the City has not intentionally opened a nontraditional forum for public discourse. *Cornelius*, 473 U.S. at 802. Finally, they are not limited public forums in that the City has not opened them for certain groups or for the discussion of certain topics. *Walker*, 135 S. Ct. at 2250.[5] While the Union asserts that the City's opening of the library for voting is "patently inconsistent with the concept of nonpublic forums," the Supreme Court recently held a polling place to be a nonpublic forum. *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1886 (2018).

It is true, as the Union argues, that there is case law treating libraries as public, designated, or limited public forums. *See, e.g. Deans v. Las Vegas Clark Cty Library Dist.*, 220 F. Supp. 3d 1058, 1062 (D. Nev. 2016) (public forum); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1128 (10th Cir. 2012) (designated public forum); *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1259 (3d Cir. 1992) (limited public forum). However, both *City of Albuquerque* and *Kreimer* considered the library *interior* and whether certain members of the public could be restricted from accessing the library. *City of Albuquerque*, 667 F.3d at 1128 (sex offenders); *Kreimer*, 958 F.2d at 1246 (homeless persons). And while the Union does reasonably rely on

---

[3] Though it makes no difference in the forum analysis, given that the senior center as a whole is a nonpublic forum, the relevant forum with respect to the senior center is also limited to the exterior walkways where the representatives sought access. Docket no. 31-3 at 4-5.

[4] Were the Court to instead conclude that the library exterior is a *limited* public forum, the subsequent analysis would remain the same, as the standard for both categorizations is identical: reasonable and viewpoint neutral. *Am. Freedom Def. Initiative*, 136 S. Ct. at 1023.

*Deans* for the proposition that a library plaza was a public forum, the 5000-square-feet plaza in that case hosted public events and acted as a public "thoroughfare," including providing access to an abutting public college, which that court noted was a "broad 'free speech zone.'" *Deans*, 220 F. Supp. 3d at 1063.   In contrast, the library grounds here were "not designed to be used as a thoroughfare for members of the general public to walk from one area to another for non-library reasons…," docket 31-1 at 2, nor is there an abutting "broad free speech zone" like the public college in *Deans*. That case also noted unrebutted testimony that "most libraries allow expressive activity in similar outside plazas," *id.*, but in this case there is no evidence that *any* City library allows expressive activity in its exterior grounds.

Finding that the library grounds are nonpublic forums is consistent with federal case law. A plurality in *United States v. Kokinda* held that a sidewalk leading to a post office entrance was a nonpublic forum. *United States v. Kokinda*, 497 U.S. 720, 730 (1990). Unlike regular public sidewalks, that sidewalk was not a "public thoroughfare" or a "conduit in the daily affairs of the locality's citizens." *Id.* at 727. Rather, it was "constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door." *Id.* at 728. Federal courts of appeals have uniformly applied the *Kokinda* plurality's reasoning to similar cases. *See, e.g. United States v. Belsky*, 799 F.2d 1485, 1489 (11th Cir. 1986); *Jacobsen v. U.S. Postal* Service, 993 F.2d 649, 656 (9th Cir. 1992); *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1071 (D.C. Cir. 2012). Contrary to the Union's assertions, these cases do not stress the transactional business that occurs within post office buildings; rather, they focus on the limited purpose of the walkways, which is to provide ingress and egress to and from the post office, much the same as the "walkways

on library grounds are . . . intended to provide safe and efficient access so that patrons can come inside to use the library's services…" Docket no. 31-1 at 2.[6]

### ii.   Reasonableness of the City's Policies

Having determined that both the senior center and the library's exterior grounds are nonpublic forums, the Court will "employ[] a distinct standard of review to assess speech restrictions…because the government, 'no less than a private owner,' retains the power to preserve the property under its control for the use to which it is lawfully dedicated." *Perry*, 460 U.S. at 46 (1983) (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966). For nonpublic forums, "the state may reserve the forum for its intended purpose…as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's views." *Perry*, 460 U.S. at 46. Thus, there are two factors: (1) reasonableness, and (2) viewpoint neutrality.

As to the first factor, reasonableness, the "touchstone" for evaluating speech restrictions in nonpublic forums is "whether they are reasonable in light of the purpose which the forum at issue serves." *Id.* at 49. Notably, the government's restriction on access to a nonpublic forum "need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. The government may even impose content-based restrictions in nonpublic forums, "including restrictions that exclude political advocates and forms of political advocacy." *Mansky*, 138 S. Ct. at 1885-86. In finding that a restriction on solicitation on post office sidewalks was reasonable, the Supreme Court reasoned that "Since the act of soliciting . . . contributions usually has as its objective an immediate act . . . it has the potentiality for evoking highly personal and subjective reactions." *Kokinda*, 497 U.S. at 732-33. Solicited members of the public "often must make a hasty

---

[6] Though the Union objects to Dovalina's assertion that the senior center's "walkways are not public thoroughfares to any location other than the Northeast Senior Center," (docket no. 39 at 7), the Court will not consider that statement here because, as noted above, both parties have conceded the senior center is a nonpublic forum.

decision whether to share his resources with an unfamiliar organization while under the eager gaze of the solicitor," and the solicitations were "inherently disruptive" to post office business. *Id.*

In this case, it was reasonable, in light of each forum's purpose, for the City to forbid solicitation at the senior center and to channel such activity into the free speech areas at the library.[7] *Perry*, 460 U.S. at 49. With respect to the library, the purpose of the exterior walkways was "to provide safe and efficient access so that patrons can come inside to use the library's services." Docket no. 31-1 at 2. It is reasonable, in light of that purpose, to restrict the solicitation of signatures on such exterior walkways and the adjacent grounds because such restrictions provide for safer and more efficient access for patrons. As in *Kokinda*, the activities of the solicitors had the potential to be "inherently disruptive" to library patrons, and the solicitation had as its "objective an immediate act" – that is, the signing of a petition. *Kokinda*, 497 U.S. at 732-33. A patron interrupted by one of the Union representatives would be pressed to "make a hasty decision" whether to endorse the proposed initiative, and the encounter could "evok[e] highly personal and subjective reactions," particularly where the representatives' position outside the entrances made passing them unavoidable. *Id.*; docket no. 31-2 at 3-7; docket no. 31-3 at 3.

In critiquing the reasonableness of the City's selection of the free speech area, the Union argues the City's designations were ad hoc and chosen based on convenience and efficiency, pointing out the multiple geographic markers branch managers chose as boundaries. Docket no. 50-1 at 72-84. But the law does not require the City to select the most reasonable limitation; it merely requires that the limitation be reasonable. *Cornelius*, 473 U.S. at 808. The Union points to

---

[7] The City argues that because the library exterior is a nonpublic forum, the library could prohibit solicitation altogether and, therefore, providing a free-speech area is necessarily reasonable. Docket no. 31 at 11. However, speech restrictions on nonpublic forums are still subject to a reasonableness test; holding that all such restrictions in nonpublic forums are necessarily reasonable would obviate the need for a reasonableness test, and the case law consistently shows when the government *does* impose restrictions in a nonpublic forum, it must do so in a reasonable way. *Perry*, 460 U.S. at 46

no alternative areas the City could have chosen that would still further the City's legitimate interest in safe and efficient access for library patrons, nor does the Union show that the City's choice of location affected the Union's ability to obtain the needed signatures. But even if the Union *were* to offer such evidence, the City is still not required to select the most reasonable (or least restrictive) alternative – it need only be reasonable, and giving branch managers flexibility in selecting the location is reasonable considering the geographic variation among the City's 29 branch libraries with free speech areas, docket no. 39-3 at 2-8, and the library's stated goal of "balanc[ing] the ability of all library users to safely and conveniently access library facilities with the ability of other individuals to gather signatures and express their views on exterior property." Docket no. 31-1 at 2.

The Union again turns to *Deans* to argue the City's policy is unreasonable, but in *Deans*, the District of Nevada found it unreasonable that the library told the petitioner there to relocate further *beyond* the free-speech zone, "contrary to speakers' reasonable expectations created by the District itself." *Deans*, 220 F. Supp. 3d at 1064.  In contrast, the City here asked the petitioners to relocate *to* the free speech area, rather than directing them to relocate *beyond* it. Further undermining the Union's reliance on *Deans*, that court issued a preliminary injunction requiring the petitioner there to confine his petitioning *to the free speech area* of that library's plaza, much the same as the City here. *See id.* at 605.

Finally, the Union cites to a Ninth Circuit case which held that relegating communicative activity to three small peripheral areas did not match the stated interest of preventing congestion and was thus not narrowly tailored. *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 862 (9th Cir. 2004). But that case evaluated a free-speech claim under the California constitution, and that court noted

that forum analysis and a speaker's access to private property are both areas where the California constitution differs from its federal counterpart. *Id.* at 856-57.

As with the library, the reasonableness of the restrictions at the senior center turns on the purpose of the senior center's exterior which, as noted above, is the relevant forum because the Union representatives sought access solely to the grounds adjacent to parking lots and walkways outside of the senior center. *Cornelius*, 473 U.S. at 801. The purpose of those exterior locations is "to facilitate safe and efficient access" to the senior center. Docket no. 31-3 at 4. It is reasonable, in light of that stated purpose, for the senior center to forbid solicitation to keep the parking lot and walkways clear, particularly considering the mobility impairments of many seniors at that facility and considering that the nearby sidewalk remains open to the general public. *Id.* These restrictions are also consistent with the senior center's goal of protecting the seniors from "political pressure" and "avoiding the appearance of bias or favoritism." *Id.* at 9.

### iii.   Viewpoint Neutrality of the City's Policies

In both limited and nonpublic forums, though some content-based restrictions are permissible, any restriction on speech must not be an "effort to suppress expression merely because public officials oppose the speaker's view. *Chiu*, 260 F.3d at 347 (citing *Ark. Educ. Television*, 523 U.S. at 677-78). Viewpoint discrimination is an "egregious form of content discrimination," and "the government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992). While the viewpoint-neutral requirement is well-established, a statute may still be viewpoint neutral even when the government enacts such a restriction in response to certain protests. *Hill v. Colorado*, 530 U.S. 703, 715, 724 (2000). In *Hill*, it was clear from the legislative history that the enactment of a prohibition on First Amendment activities near

healthcare centers was "primarily motivated by activities in the vicinity of abortion clinics." Nonetheless, in upholding that restriction, the Supreme Court noted the "statute is not limited to those who oppose abortion," and "[t]hat is the level of neutrality that the Constitution demands." *Id.* at 724-25.

Here, the Union argues the City's policies at the library constituted viewpoint discrimination, particularly given the posting of signage in response to the Union's free speech activities at the library branches. Docket no. 50 at 6. The Union emphasizes that the City had never previously prepared such signs and that the City distributed the signs immediately upon the commencement of the Union's protesting activities. Docket no. 50-1 at 112-117. However, even when the government enacts a restriction on free speech activities in response to certain protests, as concededly happened here, such restrictions are still viewpoint neutral if they are evenly applied. *Hill*, 530 U.S. at 715, 724. There is no summary judgment evidence rebutting the City's statement that the library has "consistently enforced the policy regarding its exterior grounds and restricts everyone wishing to engage in expressive conduct…" Docket no. 31-1 at 3. This is "the level of neutrality that the Constitution demands." *Hill*, 530 U.S. at 725.

With respect to the senior center, the Union argues there is nothing in the senior center's policy "to safeguard that the City does not discourage one viewpoint and advance another" because there are no written guidelines in the approval or disapproval of speakers at the senior center. Docket no. 50 at 8-9. It is true that "standards provide the guideposts that . . . allow courts to quickly and easily determine" whether the government "is discriminating against disfavored speech." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1988). However, the senior center "vetting" applies only to those seeking to make a presentation inside the center, and the Union concedes it never sought to make such a presentation. Docket no. 31-3 at 4-5.

In other words, the viewpoint neutrality of the senior center's policy regarding presentations is irrelevant to a determination of the neutrality of the senior center's policy regarding the exterior grounds, walkways and parking lots. And in that exterior, there is no free speech zone, and there is no indication that *any* outside group was allowed to use the senior center's exterior. *Id.* at 3-5. Therefore, there is no discretionary approval of one viewpoint at the expense of another, so as a matter of law, there is no viewpoint discrimination. The City consequently did not violate the Union's First Amendment rights, and summary judgment on this claim is GRANTED.

### B.  Plaintiff's Retaliation Claim

To establish a prima facie First Amendment retaliation claim, a plaintiff must show that (1) the plaintiff was "engaged in constitutionally protected activity," (2) the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity," and (3) the defendant's "adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct." *Culbertson v. Lykos*, 790 F.3d 608, 618 (5th Cir. 2015). Such adverse actions "must cross a certain threshold of harm" to be actionable, *Colson v. Grohman*, 174 F.3d 498, 513 n.8 (5th Cir. 1999), and a plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a "de minimis inconvenience" to her exercise of First Amendment rights. *O'Neal v. Falcon*, 668 F. Supp. 2d 979, 987 (W.D. Tex. 2009) (citing *ACLU of Md. v. Wicomico Cty., Md.*, 999 F.2d 780, 786 n.6 (4th Cir. 1995)).  "Certainly, some retaliatory actions  – even if they actually have the effect of chilling the plaintiff's speech – are too trivial or minor to be actionable as a violation of the First Amendment."  *Kennan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

However, a plaintiff need not actually be deprived of her First Amendment rights in order to establish First Amendment retaliation. *Id.*

In *Colson*, city officials "falsely accused [a city councilor] of criminal acts, urged prosecutors to investigate her, and instigated a recall election against her because they disagreed with her political views and votes." *Colson*, 174 F.3d at 500. However, she was "never arrested, indicted, or subjected to a recall election," such that the court held "retaliatory criticisms, investigations, and false accusations that do not lead to some more tangible adverse action are not actionable." *Id.* at 511-13. It also noted that the alleged retaliation "did not stop her from running for reelection" in its finding that the harm did not rise to a sufficiently adverse level." *Id.* at 514.

Here, the Union claims retaliation in that the City posted signs at the library branches, asked Union representatives to relocate, and called the police who then gave trespass warnings and threatened arrest if representatives refused to relocate. Docket no. 39 at 17. In turn, the City argues that even if all these allegations are taken as true, none crosses the "threshold of harm" necessary to sustain a retaliation claim. Docket no. 31 at 13. The Court agrees.

As to the first element of a retaliation claim, as this Court concluded above, the Union was not engaging in a "constitutionally protected activity," *Culbertson*, 790 F.3d at 618, by soliciting signatures on the exterior grounds adjacent to walkways of the library and senior center. While the First Amendment would protect such activities in a different forum, such activities are not protected in a nonpublic forum. The retaliation claim fails on this basis alone.

As to the second element, the City's "adverse actions" did not cross the threshold of harm necessary for a retaliation claim because any such harm was intangible or otherwise justified. *Colson*, 174 F.3d at 513. The signs posted at the library branches conveyed only accurate information notifying patrons of their rights with respect to the petition drive. Docket no. 50-3 at

11. The signs did not explicitly discourage patrons from signing the petition or contest the merits of the petition's proposals. *Id.* Even if the signs cast general suspicion on the Union's petitioning activities, as the Union argues, such an effect would exemplify the kind of intangible criticism that the Fifth Circuit has found insufficient for retaliation claims. *See Colson*, 174 F.3d at 513. Further, when police arrived, they issued oral trespass warnings and threatened arrest if the petitioners did not move, but, as in *Colson*, the police made no arrests. Docket no. 31 at 13. Finally, the Union's success in its signature drive, docket no. 31-4 at 1, weakens the Union's argument that the City's adverse actions were sufficiently tangible to cross the required threshold of harm. *Colson*, 174 F.3d at 500.

As to the final element, the Union contends that the City's enforcement actions were substantially motivated against its conduct because, "but for the content and purpose of Plaintiff's petitions, the City would not have enforced its . . . policies and practices . . . or threatened [petition circulators] with arrest." Docket no. 26 at 15. The Union cites the signs posted at the library branches in response to their activities, as well as an internal library email discussing an alternative location for the free speech area at one of the library branches. Docket no. 39-2 at 2. The Union also references a press conference in which the Mayor of San Antonio publicly expressed disapproval of the Union's efforts. Docket no. 26 at 3.

Although a circumstantial "trail of breadcrumbs" can show that the City's actions were specifically hostile to the Union's activities, *Jordan v. Ector Cty.*, 516 F.3d 290, 301 (5th Cir. 2008), the summary judgment evidence does not rise to this level of specific hostility. The City implemented the policies at both locations years before the Union began its petitioning. Docket no. 31-1 at 5; docket no. 31-3 at 9. And while the City did post the signs at the library branches in response to the Union's activities, those signs do not discuss the "content [or] purpose" of the

petitions, as the Union claims. Docket no. 31-1 at 6. Instead, the signs displayed factually accurate information informing library patrons of their rights with respect to *any* petition solicitation. And even with the Mayor's critical remarks in mind, the Union has failed to show that the City was more permissive with any other group engaged in similar activities at a similar location.

Accordingly, the Union's retaliation claim fails on any one of the grounds discussed above. Summary judgment on this claim is consequently GRANTED.

### C. Plaintiff's Vagueness Claim

The Union's third claim is that the City's Free Speech policies are so vague and amorphous so as to encourage arbitrary and discriminatory enforcement. Docket no. 26 at 15-16. Courts have long held it is a "basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Def. Distributed v. U.S. Dep't. of State*, 121 F. Supp. 3d 680, 700 (W.D. Tex. 2015) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Under the first element, with respect to the library branches, the Union argues the City did not distribute the locations of the free speech areas externally, so speakers might not learn of the policy until arriving at a library branch. Docket no. 50-1 at 32. But this does not mean that such speakers lacked sufficient notice to act accordingly. Once the representatives began collecting signatures, library staff provided them with copies of the free speech policy and gave them opportunities to comply before notifying police. Docket no. 31-2 at 16-23. Further, the library was able to give a copy of the policy to anyone who asked in advance. Docket no. 50-1 at 42-43. The

Union representatives were thus given ample opportunity to "act accordingly" before any adverse action was taken, *see Fox*, 567 U.S. at 253, and the prohibition on speaking outside of the free speech areas was "clearly defined" by the established free speech areas. *Grayned*, 408 U.S. at 108.

With respect to the senior center, the Union again was given ample opportunity to "act accordingly" given that the relevant policy prohibited *any* petitioning at the senior center's exterior. Here, the Union addresses at detail the vetting process for giving presentations inside, but as noted above, the relevant forum is the senior center's exterior, and the policy there permitted no solicitation or presentation by any group. Docket no. 31-3 at 4. Regulated parties like the Union therefore clearly know what is required of them, as the prohibitions are "clearly defined."

The second element under the vagueness claim overlaps with the reasonableness analysis under the free speech claim. It is true that the library's Free Speech Policy itself does not specifically instruct library staff what factors to consider when designating their Free Speech areas. Docket no. 31-1 at 5. Instead, the policy requires that library staff select the free speech areas "to allow for a full range of freedom of speech activities while also affording adequate protection to the efficient functioning of the library." *Id.* These instructions do not leave library branch staff with complete discretion, but rather provide two important considerations to balance when selecting a site: freedom of speech and library efficiency.

This degree of generality is appropriate given the differences among the various libraries and, importantly, the familiarity that each branch's personnel would have with the surrounding grounds and traffic patterns. Furthermore, nothing in the record indicates that any free speech areas were relocated to a less advantageous position after the Union commenced its activities; although the Cody library did change its free speech area, the Cody branch staff selected the new location according to the delineated criteria, relocating the free speech area to keep petitioners away from

24

the entrance but also to make them more visible. Docket no. 39-2 at 2. This relocation decision was precisely in line with the Free Speech Policy's directive to balance library efficiency and free speech interests.

But most importantly, there is no "vague law [which] impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Grayned*, 408 U.S. at 108. The policies in both locations invite no subjective interpretation on the part of law enforcement officials because the petitioner is either within the free speech area, or the petitioner is not. Summary judgment on this claim is GRANTED.

### D.  Plaintiff's Free Speech and Vagueness Claims Under the Texas Constitution

The Union also asserts free speech and vagueness claims under the Texas Constitution. Docket no. 26 at 16. The Texas Constitution provides protections for free speech and due process in addition to those provided by federal law. *See* TEX. CONST. ART. 1 § 8, 19. However, absent an articulated reason that the Texas Constitution offers greater protections than the federal one, the Texas Supreme Court assumes "that the two protections are identical." *Pruett v. Harris Cty. Bail Bond Bd.*, 249 S.W.3d 447, 455, n. 5 (Tex. 2008) (citing *Tex. Dep't of Transp. v. Barber,* 111 S.W.3d 86, 106 (Tex. 2003)). Both the Union and the City agree that the application of the Texas Constitution's free speech and due process provisions is consistent with federal law. Docket no. 26 at 16; docket no. 31 at 15-16. Because summary judgment on the federal claims is granted, summary judgment on the state law claims is also GRANTED.

### CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (docket no. 31) is GRANTED.

The Clerk is DIRECTED to enter judgment in favor of Defendant and against Plaintiff.

Plaintiff shall take nothing by its claims.

SIGNED this 1st day of September, 2019.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE